**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA HOLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-cv-05663 |
| | ) | Magistrate Judge Susan E. Cox |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Barbara Hollins ("plaintiff") moves this Court for a reversal or remand of the final

decision of the Commissioner for Social Security ("Commissioner") partially denying her claim for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and

XVI of the Social Security Act.[1] For the reasons stated below, plaintiff's motion is denied.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on August 17, 2001 claiming that she became

disabled on May 15, 2001 due to arthritis in the shoulder, a herniated disc, muscle spasms, and

bilateral carpal tunnel.[2] She was denied initially, on reconsideration, and by the administrative law

judge ("ALJ") William Wenzel in his decision dated April 28, 2004.[3] The Appeals Council granted

plaintiff's request for review and remanded the case back on December 17, 2004.[4] Meanwhile,

---

[1] 42 U.S.C. § 405 (g); the parties have consented to the jurisdiction of this Court by agreement and pursuant to 28 U.S.C. § 636.

[2] R. at 115-17. Subsequently plaintiff amended the onset date to October 1, 2001. R. at 831.

[3] R. at 643-52.

[4] R. at 658-60. Even though the Appellate Council indicated that it reviewed the ALJ's decision of August 31, 2000 (R. at 659), upon reviewing the entire record this Court concludes that the Council actually reviewed the ALJ's decision of April 28, 2004. The April 28, 2004 decision is the only substantive decision of the ALJ finding

plaintiff filed a new application for SSI and DIB in July of 2004 alleging shoulder and back problems, no use of her left hand, arthritis in feet, and lupus. [5] The benefits were denied, and the 2004 application was consolidated with the 2001 application before the final hearing in front of the ALJ took place.[6] On remand, the ALJ held a hearing on May 11, 2005 and a supplemental hearing on August 16, 2005.[7] Finally, on September 26, 2006 ALJ Wenzel issued a partially favorable decision, finding plaintiff disabled as of May 1, 2005 but not as of the claimed amended onset disability date of October 1, 2001.[8] The Appeals Council denied plaintiff's request for review, leaving the ALJ's September 2006 decision as the final decision of the Commissioner.[9] Plaintiff timely commenced this action on October 5, 2007.

## II. STATEMENT OF FACTS

### A. Introduction

Plaintiff was born in 1967, making her 36 years old on the date the ALJ issued his final decision.[10] She completed high school and was previously employed in various capacities, including a developmental aid, developmental tech, cashier, assembly line worker, packer, and, most recently, a certified nurse assistant.[11] She is married and resides with her five children.[12] Plaintiff's health

---

plaintiff not disabled (R. at 643-52), while on August 31, 2000 the ALJ issued an order dismissing plaintiff's request for hearing for failure to show cause for not appearing at the previously scheduled hearing on a prior application for SSI (R. at 643). The August 31, 2000 order is not a part of the record. Additionally, it is the ALJ's understanding that the Appellate Council reviewed and remanded his April 2004 decision (R. at 781, 828).

[5] R. at 128, 132.
[6] R. at 31.
[7] R. at 828, 781.
[8] R. at 38-39.
[9] R. at 9.
[10] R. at 650.
[11] R. at 36, 152.
[12] R. at 115-16.

problems related to her joints began in 1997 when she suffered a work-related injury and was diagnosed with a left shoulder impingement syndrome.[13] She underwent arthroscopy and repair of the shoulder, followed by extensive physical therapy.[14] Between 1997 and 2000, plaintiff visited numerous doctors complaining about pain in her neck, bilateral shoulder, right arm, right wrist, and numbness and tingling in the hand.[15] However, she was released for regular work duties in April of 2001 due to satisfactory healing.[16] Nevertheless, plaintiff filed for SSI and DIB on August 17, 2001, alleging disability as of May 15, 2001, subsequently changing it to October 1, 2001.[17] At the time of filing the application plaintiff was still employed by the Sheridan Health Care Center as a certified nurse aid, but she changed her schedule from full time to part time sometime in May of 2001.[18]  In November of 2001 plaintiff sustained an injury to her left wrist while at work, lifting a patient from a bed into a chair.[19] She had never had problems with her left wrist before this injury but she did have a history of problems with her left shoulder and right wrist in the past.[20] In March of 2004 plaintiff was in a car accident when her vehicle was rear-ended by another car.[21] This accident caused plaintiff some additional back and neck pain.[22]

**B. Medical Evidence**

The record contains extensive medical records of plaintiff's condition and limitations for the

---

[13]R. at 647.

[14]*Id.*

[15]*Id.*

[16]*Id.*

[17]R. at 115-17, 828.

[18]R. at 785-86.

[19]R. at 354.

[20]*Id.*

[21]R. at 535.

[22]R. at 535-37.

period in question.[23] The ALJ reviewed and considered the record in its entirety when he rendered both of his decisions.

In December of 2001, just a few weeks after the plaintiff sustained a left wrist injury, Roger Collins, M.D., plaintiff's treating orthopedist, stated in his progress notes that, due to plaintiff's work-related left wrist injury, there was evidence of some inflammation and perhaps discomfort but there was no inflammatory arthritis or evidence of a significant injury involved.[24] He recommended conservative treatment.[25] Dr. Collins noted that plaintiff's left shoulder seemed to be well after the surgery.[26] He provided plaintiff with a splint for her wrist.[27] Subsequently, Dr. Collins referred plaintiff to Thomas Becker, M.D., a hand specialist.[28]

In January of 2002, Scott Kale, M.D., a state examining physician, performed a consultative examination of plaintiff for the Social Security Administration ("SSA").[29] He opined that plaintiff had reduced grip strength 4/5 bilaterally and noted that she complained of pain and tenderness "all over, which was compatible with a diagnosis of fibromyalgia."[30] He also stated that plaintiff demonstrated a normal range of motion in the cervical spine, lumbar spine, shoulders, elbows, wrists, fingers, hips, knees, and ankles, and had normal ability to grasp and manipulate objects.[31] Dr. Kale diagnosed fibromyalgia, probable depression, and obesity.[32]

---

[23]Since plaintiff was found disabled as of May 1, 2005, the period in question includes the period of time from October 1, 2001, the alleged onset date of disability, through April 30, 2005.

[24]R. at 355.

[25]R. at 355.

[26]R. at 354.

[27]R. at 383.

[28]R. at 356.

[29]R. at 349-352

[30]R. at 351.

[31]*Id.*

[32]R. at 352.

In February of 2002, Barry Free, M.D., another state examining physician, prepared plaintiff's physical residual functional capacity ("RFC") assessment for the SSA.[33] He stated that plaintiff could occasionally lift or carry twenty pounds, and ten pounds frequently; could stand, walk or sit about six hours in an eight-hour workday; had unlimited ability to push and pull with both upper and lower extremities; did not have any postural or manipulative limitations; and could perform the full range of light work.[34] Dr. Free diagnosed fibromyalgia, herniated disc C6-C7, and obesity, but concluded that claimant was not disabled through the date of the assessment.[35]

Also in February of 2002, plaintiff went to see Dr. Becker, a hand specialist, pursuant to the referral of Dr. Collins.[36] Dr. Becker assessed that plaintiff had a volar intercalated segment instability, multiple carpal bone cysts, and an ulnar minus variance.[37] At the same time, Dr. Becker concluded on February 15th, 27th, and on March 20th after examining plaintiff on these days, that plaintiff sufficiently recovered to be able to return to work with a condition that she will wear a splint and attend a two-week therapy.[38]

In March of 2002, Daniel Nagle, M.D., a hand surgeon, opined that plaintiff had a bilateral midcarpal instability in her wrists and arthritic changes at the lunotriquetral articulation with cyst formation.[39] Nevertheless, Dr. Nagle believed that plaintiff was properly released for work wearing a splint noting, however, that she will not be able to lift more than five to ten pounds with her left

---

[33]R. at 374-80.
[34]*Id.*
[35]R. at 374, 381.
[36]R. at 415, 356.
[37]R. at 415.
[38]R. at 414, 456, 457.
[39]R. at 385.

hand.[40]

In April of 2002, Kenneth Margules, M.D., plaintiff's treating rheumatologist, stated that plaintiff had arthritis of the left wrist since January of 2001, causing minor limitations in her ability to do reaching, handling, and perform fine manipulation.[41]

In May of 2002, Dr. Nagle performed a left wrist surgery and discharged plaintiff in satisfactory condition.[42] Plaintiff admitted in May of 2002 that even though she still had troubles lifting items with her left wrist, her condition had improved after the surgery.[43] Later, in July of 2002, plaintiff again stated to Dr. Nagle that her left wrist was feeling relatively good.[44]

In October of 2002, Dr. Nagle noted that plaintiff's strength was gradually returning and the range of motion in her left wrist was almost equal to that of her right wrist.[45] There was no sign of midcarpal instability in her left wrist at that time.[46] Dr. Nagle concluded that plaintiff would be ready to get back to work relatively soon.[47] Three months later Dr. Nagle reported that plaintiff's left wrist exam was benign except for the presence of discomfort.[48] He recommended a midcarpal fusion to eliminate the clunking in her wrist, but plaintiff was not interested.[49]

In December of 2002, plaintiff's RFC evaluation was performed at the request of Dr. Nagle to determine plaintiff's current abilities to return to work.[50] The evaluation demonstrated that

---

[40]R. at 386.
[41]R. at 422.
[42]R. at 509-10.
[43]R. at 519.
[44]R. at 524.
[45]R. at 522.
[46]*Id.*
[47]R. at 521-22.
[48]R. at 515.
[49]*Id.*
[50]R. at 424.

plaintiff had difficulty kneeling, but not sitting and walking, and had reduced grip strength in both hands.[51] Plaintiff complained of intense wrist pain during the examination, so it was interrupted.[52] Dr. Nagle noted that the evaluation demonstrated a mild midcarpal instability on the left side and more noticeable right side midcarpal instability, and that plaintiff would not be able to perform her previous job as a certified nurse assistant.[53]

In March of 2004 plaintiff underwent rehabilitative care in Waukegan Medical Center for neck and back pain caused by the car accident on March 1, 2004.[54] She was diagnosed as having a cervical, thoracic, and lumbosacral sprain/strain.[55]

In August of 2004 Dr. Margues submitted an evaluation report to the SSA.[56] He stated that plaintiff suffered from rheumatoid arthritis and that she had pain, tenderness, stiffness, swelling, and fatigue in both the left and right wrists and hands.[57] He noted a reduced bilateral grip strength of 2/5, with zero degrees of extension / twenty degrees of flexion in her left wrist, and five degrees of extension / thirty degrees of flexion of her right wrist.[58] According to Dr. Margules, these limitations may have persisted since October of 2001.[59]

In October of 2004 Dr. Kale again performed plaintiff's examination for the SSA.[60] He noted that plaintiff had a history of moderately active rheumatoid arthritis, status post left shoulder repair

---

[51]R. at 425.

[52]*Id.*

[53]R. at 517.

[54]R. at 535.

[55]R. at 536.

[56]R. at 594.

[57]*Id.*

[58]R. at 595.

[59]R. at 602.

[60]R. at 566-68.

with good result and normal range of motion, obesity, and that she used a cane to walk even though it was unnecessary.[61] In addition, Dr. Kale observed 3/5 reduced grip strength bilaterally but noted that he was not sure whether plaintiff "was trying very hard."[62]

Also in October of 2004, Henry Rohs, M.D., a state examining physician, prepared an RFC assessment for the SSA and concluded that plaintiff could occasionally lift twenty pounds and ten pounds frequently, stand, walk, and sit for six hours in an eight-hour workday with no limitations in pushing and pulling.[63] Dr. Rohs diagnosed rheumatoid arthritis and obesity.[64] When plaintiff reported grip strength of 2/5, Dr. Rohs questioned her effort and noted that on her latest hospital visit she stated that she hurt her shoulder while moving a dresser.[65] Dr. Rohs opined that with such a reduced grip strength plaintiff would not have been able to move a dresser, and also noted that she retained full range of motion of her hands and wrists.[66] Dr. Rohs found plaintiff not disabled and capable of work with certain limitations.[67]

In March of 2005 Francis J. Vincent, M.D., a state examining physician prepared yet another disability determination report for the SSA and concluded that plaintiff suffered from rheumatoid arthritis, degenerative arthritis, and obesity, but nevertheless was not disabled.[68]

Finally, in August of 2005 Dr. Margules filled out a physical functional capacity questionnaire, where he stated that plaintiff suffered from rheumatoid arthritis with swelling,

_____

[61]R. at 569.
[62]R. at 568.
[63]R. at 571.
[64]R. at 570.
[65]R. at 576.
[66]R. at 573, 576.
[67]R. at 577.
[68]R. at 43.

stiffness, pain, tenderness, and limitation in motions in both of her wrists and hands.[69] Dr. Margules noted that plaintiff had "profound" limitation in grasping and fingering, bilaterally.[70] Dr. Margules also noted that plaintiff had been taking Methotrexate since January of 2003 which helped her somewhat, but its side effects occasionally interfered with her attention and concentration.[71] The report concluded that plaintiff could walk only two blocks without pain, and stand, sit, and walk for two hours in an eight-hour work day.[72] Dr. Margules continued to treat plaintiff until July of 2006 and prescribed many different medications, including Methotrexate, Vicodin, Soma, Fluoxetine, Prednisone, Aceiphex, and Tylenol 4.[73]

## C.        The ALJ's April 28, 2004 Decision

Plaintiff's first administrative hearing before ALJ Wenzel took place on October 15, 2002.[74] Plaintiff was present and represented by paralegal Larry McShane.[75] Vocational Expert ("VE") Linda Gels was also present and prepared to testify, having previously received all relevant exhibits.[76] The hearing, however, did not proceed because plaintiff was missing certain work related documents and medical records.[77] The second hearing was held on May 15, 2003 where plaintiff was present and again represented by Mr. McShane.[78] The VE, Ms. Gels, testified at that hearing.[79]

---

[69]R. at 601.

[70]R. at 603.

[71]R. at 602, 604, 38.

[72]R. at 602-03.

[73]R. at 615.

[74]R. at 850-56.

[75]R. at 852.

[76]R. at 63, 852.

[77]R. at 853.

[78]R. at 828.

[79]The record does not contain a transcript of that hearing, however, there are numerous references to Ms. Gels' testimony. *See, e.g.*, R. at 256, 659.

In his decision dated April 28, 2004, ALJ Wenzel ruled that plaintiff was not disabled and thus was not entitled to DIB and SSI.[80] The ALJ followed the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a). Before beginning the five-step process, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act,[81] meaning that she acquired sufficient quarters of coverage to receive DIB and SSI.[82] At step one, the ALJ found plaintiff received unemployment compensation benefits from April 2002 through December 2002.[83] Plaintiff applied for many jobs telling prospective employers that her doctor restricted her from lifting without a wrist splint.[84] Nonetheless, the ALJ did not deny plaintiff's application on step one because there was no evidence of any disqualifying substantial gainful work activity after October 1, 2001, the onset date of alleged disability.[85] The ALJ then found at step two that plaintiff had a combination of impairments qualifying as severe under the Social Security Regulations which excluded fibromyalgia, but included status post work injury to the left wrist, arthropathy of the left wrist, status post hand surgery in May of 2002, a history of cervical disk disease, stable during the period at issue.[86]

Though the ALJ found that plaintiff suffered from severe impairments, he concluded at step three that plaintiff's impairments did not meet or medically equal any of the SSA listings[87] because there was no evidence of inability to perform gross and fine movements effectively under section

---

[80]R. at 652.

[81]42 U.S.C. §§ 416(I), 423.

[82]R. at 645.

[83]*Id.*

[84]*Id.*

[85]*Id.*

[86]*Id.*

[87]20 C.F.R. Pt. 404, Subpt. P, App. I.

1.02B, or evidence of inability to ambulate effectively under section 1.02A.[88] With regard to plaintiff's mental condition, the ALJ did not find any impairments that would satisfy criteria under section 12.04.[89]

Next, the ALJ determined plaintiff's RFC.[90] A claimants' RFC represents what they can still do despite their limitations.[91] The ALJ concluded that plaintiff had a RFC to lift or carry five to ten pounds and occasionally push, pull, crawl and climb ladders using her left hand, no limits on using her right hand, and no limits on standing, sitting, or walking.[92] In reaching his conclusion, the ALJ considered the entire record, including medical records, plaintiff's allegations of disabling symptoms and limitations, side effects of her medications and complaints of pain, as well as the combined effects of obesity with her other impairments, according to Social Security Ruling 02-01p.[93] First, the ALJ listed all of plaintiff's allegations regarding her condition, including arthritis in both shoulders, constant pain, inability to lift or pull anything, numbness and inflamation in her wrists, hands, fingers, thumbs and shoulders, inability to do household shores, headaches and memory loss, and inability to sleep through the night.[94] Then, the ALJ turned to the objective medical evidence and concluded that the RFC finding was fully supported by the medical records while plaintiff's allegations were exaggerated.[95]

The ALJ summarized plaintiff's medical history from 1997 to April of 2001, noting her

---

[88]R. at 646.

[89]*Id.*

[90]*Id.*

[91]20 C.F.R. § 404.1545(a)(1).

[92]R. at 646.

[93]R. at 646-50.

[94]R. at 647.

[95]R. at 647-49.

shoulder injury and treatment, joint pain, and fibromyalgia.[96] However, by April of 2001 plaintiff

fully recovered and was released by Dr. Hamming,[97] a treating physician, to regular work duties (as

a certified nurse assistant).[98] Then the ALJ reviewed the records of plaintiff's treating physicians Dr.

Collins and Dr. Margules, hand specialist Dr. Becker, and hand surgeon Dr. Nagle.[99] Each doctor

had indicated certain limitations and impairments that plaintiff had, including obesity, fibromyalgia,

probable depression, volar intercalated segmental instability, multiple carpal bone cysts, bilateral

midcarpal instability, left carpal tunnel syndrome, and inability to lift with her left wrist more than

ten pounds.[100] The ALJ concluded that even though these are serious limitations, they do not amount

to disability and do not support a more limiting RFC than he had determined.[101] For instance, the

ALJ noted that plaintiff's treating physicians were choosing routine and conservative courses of

treatment, inconsistent with what one would expect had plaintiff been truly disabled.[102]  The ALJ

further noted that in late 2001, after plaintiff sustained the wrist injury, Dr. Collins asserted that

there was no evidence of inflammatory arthritis.[103]  In addition, the ALJ stated that in 2002, Dr.

Nagle released plaintiff for work wearing a splint, in spite of all her limitations.[104] Finally, the ALJ

wrote that state-employed physicians Drs. Kale and Free, who performed plaintiff's examinations

in early 2002, concluded that plaintiff was not disabled in spite of their diagnoses of her obesity,

---

[96]R. at 647-48.

[97]Dr. Hamming's first name is not provided anywhere in the record.

[98]R. at 648. The record contains hardly any medical records prior to January of 2001, therefore the medical information prior to 2001 is taken from the ALJ's April 2004 decision.

[99]*Id.*

[100]*Id.*

[101]R. at 649.

[102]R. at 648-49.

[103]R. at 648.

[104]*Id.*

fibromyalgia, and probable depression.[105] The ALJ stressed that he did not give the controlling weight to the opinions of state examining physicians, but he did give them some weight since the opinions were consistent with the rest of the medical evidence.[106]

Next, the ALJ addressed lack of plaintiff's credibility.[107] The ALJ pointed out that plaintiff reported that she had not been working since the alleged date of her disability, which later turned out not to be true.[108] Also, the daily activities that plaintiff described she could do were not consistent with her complaints of disabling symptoms and limitations.[109] Additionally, the routine and conservative treatment by her physicians did not support the extent of her alleged limitations.[110] And finally, the ALJ noted at step one that plaintiff was collecting unemployment compensation and applying for jobs for nine months in 2002 while her disability application was pending.[111] In light of these facts, the ALJ concluded that plaintiff's allegations regarding symptoms and functional limitations were not fully credible.[112]

Finally, having established plaintiff's RFC, the ALJ proceeded to steps four and five to determine whether plaintiff was capable of performing any of her prior jobs and, if not, any other jobs existing in the national economy.[113] The ALJ relied on the VE's testimony that, given plaintiff's limitations on lifting only ten pounds, she would not be able to perform any of her prior jobs, however, based on plaintiff's vocational characteristics and the RFC, she would be able to do

---

[105]*Id.*

[106]R. at 649.

[107]*Id.*

[108]*Id.*

[109]R. at 650.

[110]*Id.*

[111]R. at 645.

[112]R. at 650.

[113]*Id.*

a full range of sedentary work that existed in the national economy in significant numbers.[114] The

VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles

("DOT").[115]  As a result, given the finding that plaintiff was able to work, the ALJ concluded that

she was not disabled under Titles II and XVI of the Social Security Act.[116]

**D. Additional Hearings After Remand: May 11, 2005 and August 16, 2005**

On December of 2004, the Appeals Council granted plaintiff's request for review of the

ALJ's April 28, 2004 decision[117] and remanded to clarify by the VE the effect of the assessed

limitations on plaintiff's occupational base and to identify examples of the appropriate positions and

their numbers in the national economy.[118]  Accordingly, a third hearing took place before ALJ

Wenzel on May 11, 2005.[119]  Plaintiff was represented by her attorney Claudia Travis, VE Linda

Gels, and a medical expert were present.[120]

The VE testified first. The ALJ asked the VE whether a person with plaintiff's work

experience, education, and certain exertional limitations could perform plaintiff's past relevant work,

such as packer, certified nurse assistant, developmental tech, technical worker I and II, and a

workshop aide / bus aide.[121]  The limitations were given according to the RFC finding from the April

28, 2004 decision.[122]  The VE analyzed plaintiff's RFC as it was applicable to all her prior jobs and

---

[114]*Id.*

[115]*Id.*

[116]*Id.*

[117]Though the Appellate Council indicated that it was reviewing the August 31, 2000 decision of the ALJ, this is an apparent mistake. *Supra* n. 5.

[118]R. at 660.

[119]R. at 828.

[120]R. at 829.

[121]R. at 832-33.

[122]R. at 833.

concluded that she was not able to perform any of those jobs.[123] Then the VE listed two kinds of positions that were still available for plaintiff: an information clerk with 1200 positions throughout the Chicago area and a gate guard with about 1500 positions.[124] Plaintiff's attorney then cross-examined the VE regarding these positions, including their DOT numbers and characteristics.[125]

Plaintiff then testified briefly that she started taking the drug Methotrexate as prescribed by Dr. Margules and that she had filed another disability application in July of 2004.[126] The ALJ then consolidated that application with the one filed in 2001, and adjourned the hearing to review new exhibits submitted by the plaintiff's attorney.[127]

On August 16, 2005 ALJ Wenzel held a supplemental hearing after receiving and reviewing the exhibits submitted with the 2004 disability application.[128] Both plaintiff and a medical expert ("ME"), Donald Charous, M.D., provided extensive testimony.[129] Plaintiff testified that she last worked in October of 2001.[130] She used a cane to walk, though it was not prescribed, and could only walk a couple of blocks before needing to rest.[131] She could stand for fifteen to twenty minutes continuously but at that point she needed to shift positions to relieve pressure from the bottom of her feet.[132] Plaintiff further testified that sitting for continuous periods of time caused spasms in her

---

[123]R. at 834-39.

[124]R. at 840.

[125]R. at 840-43.

[126]R. at 844-47.

[127]R. at 781, 829, 847-48.

[128]R. at 781-82.

[129]R. at 784-824.

[130]R. at 789. The record indicates, however, that plaintiff was employed by the Sheridan Health Care Center through March 1, 2002. R. at 123.

[131]R. at 789.

[132]Id.

lower back, shoulder, and neck.[133]  She could not complete chores around her home, but could bathe and dress herself.[134] Plaintiff explained that on the day of the hearing she was able to travel by metra to the location of the court house on her own, using her cane to walk from the train station to the court building.[135] She testified that she did not do grocery shopping without assistance because she could not lift items.[136]  Plaintiff finally testified that she was taking medication to manage her pain and was also receiving Methotrexate shots once a week, which improved range of motion in her wrists.[137] However, she explained that Methotrexate and other medications caused her side effects of drowsiness, fatigue, and diarrhea.[138] She would nap throughout the day due to fatigue from her medications and inability to sleep.[139]

The ME, Dr. Charous, then testified.[140]  He opined that plaintiff suffered from rheumatoid arthritis in the left wrist and hand, which was complicated by a left hand injury, history of surgery on the left shoulder due to shoulder impingement, questionable fibromyalgia, moderate obesity, history of affective disorder, depression, cervical disc disease, central disc herniation in the neck, and a history of lumbosacral disc impairment.[141]   The ME further noted that plaintiff's rheumatologist diagnosed synovitis which mainly affected plaintiff's ankles.[142] However, the ME

---

[133]R. at 802.

[134]R. at 801-02, 805.

[135] R. at 805-06.

[136]R. at 807.

[137]R. at 803, 809.

[138]R. at 810.

[139]R. a t 813.

[140] Dr. Charous has received all the medical records introduced in evidence in this case before the hearing. R. at 106.

[141]R. at 790, 792.

[142]*Id.*

opined that plaintiff did not meet Listing 14.09 (inflammatory arthritis)[143] because plaintiff's daily living activities were not greatly impaired, she was able to ambulate and perform gross and fine manipulation with her right hand.[144] The ME further testified that plaintiff could lift and carry ten pounds, stand and walk four hours and sit six hours out of an eight-hour work day, only occasionally stoop and crouch, never climb stairs or ladders, but could use her right upper extremities for fine and gross movement.[145] The ME finally noted that plaintiff's complaints of drowsiness and fatigue from her medications were not consistent with the medication's normal side effects but agreed that rheumatoid arthritis could cause fatigue or tiredness.[146]

Plaintiff's attorney then cross-examined the ME.[147] At this point the ALJ had to adjourn the hearing because of time constraints, without giving the VE and plaintiff's witness an opportunity to testify.[148] The ALJ did ask plaintiff and her attorney to submit any additional documents or statements to him in writing, and assured them that he would send new interrogatories to the VE about hypothetical functional capacities based on the entire record.[149]

In June of 2006 ALJ Wenzel sent the interrogatories to VE Linda Gels.[150] They described plaintiff's age, education, past relevant work experience, and health impairments and limitations,

---

[143]Listing 14.09 provided in relevant part at the time of the ALJ's decision in September of 2006: "14.09 Inflammatory arthritis. Documented as described in 14.00B6, with one of the following: 1. A. History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflamation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively, as defined in 14.00B6b and 1.00B2b and B2c." 20 C.F.R. Pt. 404, Subpt. P, App. I, Listing 14.09.

[144]R. at 815-17.

[145]R. at 816-17.

[146]R. at 819-820.

[147]R. at 819-24.

[148]R. at 824.

[149]*Id.*

[150]R. at 256.

and posed two hypothetical examples of RFC.[151] The first example of RFC included the ability to lift/carry twenty pounds with right hand occasionally and ten pounds frequently; lift/carry with left hand five-ten pounds maximum occasionally and less weights frequently, with a wrist splint; ability to handle and finger frequently but not constantly, bilaterally; sit, stand, and walk for six hours in an eight-hour work day; no crawling, no ladder climbing, no pushing or pulling with left hand over ten pounds.[152] The second example of RFC was identical to the first one but also included inability to sustain those activities eight hours a day five days a week without work absences due to pain and fatigue.[153]

The VE responded that under the first RFC hypothetical, plaintiff would not be able to perform any of her prior jobs but would be capable of performing other jobs existing in the national economy, including cashier II with 8,000 positions in the Chicago area, assembler of small products with 8,000 positions, and case aide with 6,000 positions.[154] Under the second RFC hypothetical, however, plaintiff would not be able to perform any job.[155] Having received these answers, plaintiff's attorney requested the ALJ to submit additional interrogatories to the VE with more limiting hypothetical examples of RFC.[156] The ALJ, however, declined to pose those interrogatories to the VE finding that the RFC proposed by plaintiff's counsel was not established on the record during the period in question.[157]

## F. The ALJ's Final September 26, 2006 Decision

---

[151]*Id.*

[152]*Id.*

[153]R. at 257.

[154]R. at 263.

[155]R. at 264.

[156]R. at 267-68.

[157]R. at 37.

In his decision dated September 26, 2006, ALJ Wenzel found plaintiff disabled as of May 1, 2005 but not as of October 1, 2001, the claimed onset date of disability.[158] The ALJ stated from the outset that the facts set forth in his prior decision were incorporated in this decision by reference, and any mention of the facts in this decision was made only for the sake of emphasis.[159] Therefore, the ALJ's analysis began with step two, where he listed all plaintiff's impairments and concluded that listing 14.09A (inflammatory arthritis) was not met prior to May of 2005.[160] The ALJ found that the record did not demonstrate pain, swelling, and signs of inflammation or deformity in two or more major joints as required by the listing 14.09A.[161] Instead, only one joint, plaintiff's left wrist, was at issue.[162] In addition, the ALJ continued, even if both joints were considered, the record did not demonstrate plaintiff's inability to perform fine and gross movements effectively, defined as an extreme loss of function that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities of daily living.[163] The ALJ found that plaintiff was right-hand dominant and had no loss of fine and gross movements of the right hand for the period at issue.[164]

At step three, the ALJ found that plaintiff had the following RFC prior to May of 2005: using right hand to lift and carry twenty pounds occasionally and ten pounds frequently; using the non-dominant left hand to lift and carry a maximum of five to ten pounds occasionally, and less weights

---

[158]R. at 38.

[159]R. at 31. Though the ALJ actually stated that he hereby incorporated the facts from his August 31, 2000 decision, this is an apparent mistake. *Supra* n.5.

[160]R. at 34.

[161]*Id.*

[162]*Id.*

[163]*Id.*

[164]*Id.*

frequently, with a wrist splint; perform handling and fingering frequently, but not constantly, bilaterally; could sit, stand, and walk for six hours in an eight-hour work day; no crawling, ladder climbing; and no pushing or pulling with left hand more than ten pounds.[165] In reaching this finding, the ALJ considered all symptoms and the extent to which they could be reasonably accepted as consistent with the evidence.[166] While the ALJ's review of the medical evidence led him to find that plaintiff's impairments could reasonably be expected to produce the symptoms she alleged, he again concluded that plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.[167] The ALJ supported his finding of RFC with Dr. Becker's assessment from February of 2002 releasing plaintiff to work.[168] Further, the ALJ relied on Dr. Nagle's observations of plaintiff during the years 2002 and 2003 noting progress in the condition of her left wrist.[169] The ALJ also noted that a lumbar x-ray done in September of 2004 showed no lumbosacral injury that would have prevented plaintiff from performing a limited range of light exertion prior to May 1, 2005.[170] Finally, the ALJ considered, but rejected, the conclusion of Dr. Margules in May of 2004 that plaintiff could not use her left wrist and hand at all because it was not supported by the objective medical evidence.[171]

Having determined plaintiff's RFC, the ALJ proceeded to step four where he concluded that plaintiff was unable to perform any of her past work as a developmental technician and nurse

---

[165]R. at 35.
[166]*Id.*
[167]*Id.*
[168]*Id.*
[169]*Id.*
[170]*Id.*
[171]R. at 36.

assistant prior to May 1, 2005 because these jobs required light to heavy exertion.[172] Then, at step

five, the ALJ considered whether plaintiff was capable of performing any other work existing in the

national economy.[173] Relying on the VE's answers to the interrogatories, the ALJ found that plaintiff

was able to perform light unskilled or semiskilled jobs such as a cashier, assembler of small

products, and case aide, which all existed in significant numbers in the Chicago area.[174] After

asserting that the VE's response was consistent with the DOT, the ALJ concluded that because

plaintiff was capable of performing other work, she was not disabled prior to May 1, 2005.[175]

Finally, the ALJ gave controlling weight to the opinion of Dr. Margules expressed in his

August 2005 report, that the severity of plaintiff's rheumatoid arthritis had worsened, resulting in

a profound limitation in grasping and fingering bilaterally and decreased motion of both hands and

wrists.[176] The ALJ concluded that plaintiff met the requirement of Listing 14.09A because of

inability of fine and gross manipulation, and gave Dr. Margules' August 2005 assessment a

retroactive reach to May 1, 2005, finding plaintiff disabled as of that day, but not as of October 1,

2001 as claimed by plaintiff.[177]

## III. STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual

determinations are entitled to deference.[178] The ALJ's findings of fact are conclusive if supported

---

[172]*Id.*

[173]Id.; 20 C.F.R. §404.1520, 416.920.

[174]*Id.*

[175]R. at 38.

[176]*Id.*

[177]*Id.*

[178] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

by substantial evidence.[179]  "[T]he standard of substantial evidence requires no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[180] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the courts.[181]

Of course, in order for a court to conduct a meaningful review, the ALJ must, at minimum, "articulate reasons for accepting or rejecting entire lines of evidence."[182] While an ALJ need not provide a written evaluation of every piece of evidence, he must consider all relevant evidence when reaching his decision, and must "articulate at some minimal level his analysis of the evidence."[183] The ALJ's assessment of the evidence must be detailed enough to (1) assure the reviewing court that the ALJ considered all important evidence, and (2) allow the court to trace the path of the ALJ's reasoning.[184]

## IV. SOCIAL SECURITY REGULATIONS

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled.[185] The ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to

---

[179] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

[180] *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[181] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).

[182]*Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

[183]*Id.* (quoting *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)).

[184] *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

[185] *See* 20 C.F.R. §§ 404.1520, 416.920.

perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[186] A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[187]

## V. ANALYSIS

Plaintiff argues that the ALJ's partially favorable decision of September 26, 2006 must be reversed or remanded on six grounds: (1) the ALJ's assessment of plaintiff's RFC was incorrect because the ALJ failed to consider evidence of plaintiff's obesity; (2) the ALJ's credibility analysis was incomplete because he failed to consider plaintiff's complaints of pain and the side effects of medications she was taking to alleviate her pain; (3) the ALJ's RFC assessment was incorrect because the ALJ failed to consider other evidence favorable to plaintiff; (4) the ALJ's assessment that plaintiff did not meet Listing 14.09 until May of 2005 was incorrect because medical evidence demonstrated that plaintiff's bilateral fine and gross manipulation ability was impaired prior to May of 2005; (5) the ALJ failed to ask the VE if her testimony was consistent with the DOT as required by Social Security Ruling 00-4p, and ignored the VE's testimony favorable to plaintiff; and (6) the ALJ denied plaintiff her right to a fair hearing by not allowing her attorney to cross-examine the VE, and by failing to call plaintiff's witness to testify at the August 16, 2005 hearing. The Court will examine each of these arguments in turn.

## 1. The ALJ's Consideration of Plaintiff's Obesity

Plaintiff first argues that the ALJ erred at step three of the sequential evaluation because he

---

[186] *Id.*

[187] *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

failed to consider plaintiff's obesity and its effects on plaintiff's RFC combined with the effects of plaintiff's rheumatoid arthritis. The Commissioner responds that the ALJ did consider plaintiff's obesity in his April 2004 decision, and that plaintiff does not describe any limitations which would result from her weight that were not already accounted for by the ALJ. Plaintiff, however, claims that even though the ALJ did mention obesity in his prior decision, he did not indicate how it affected his finding of plaintiff's RFC.

Social Security Ruling 02-1p explains that "obesity is a medically determinable impairment and adjudicators must take its effects into consideration when evaluating disability. The combined effects of obesity with other impairments can be greater than when the effects of each of the impairments considered separately."[188] However, a failure to explicitly consider the effects of obesity may be a harmless error.[189] The Seventh Circuit explained in *Skarbek v. Barnhart* that if the ALJ did not explicitly address plaintiff's obesity but relied on the opinions of the specialists and reviewing doctors who were aware of plaintiff's obesity, the ALJ's consideration of obesity is implicit.[190] That, the court concluded, combined with plaintiff's failure to indicate how obesity further impaired his ability to work made the error harmless.[191] The court reached the same result in *Prochaska v. Barnhart*, pointing out that the ALJ implicitly considered plaintiff's obesity through his review and discussion of her doctors' opinions who did acknowledge plaintiff's obesity.[192] The *Prochaska* court noted that no medical opinion in the record identified plaintiff's "obesity as

---

[188]SSR 02-1p, at * 1. *See also Barrett v. Barnhart*, 355 F.3d 1065, 1068-69 (7th Cir. 2004) (noting that plaintiff's obesity negatively affected her arthritis, making it more painful to stand two hours at a time than if she was not obese).

[189]*Prochaska*, 454 F.3d at 736.

[190]390 F.3d 500, 504 (7th Cir. 2004).

[191]*Id.*

[192]*Prochaska*, 454 F.3d at 737.

significantly aggravating her back injury or contributing to her physical limitations," and the plaintiff failed to show how her obesity exacerbated her physical impairments.[193] These two factors combined made the ALJ's error harmless.[194]

Applying these rules to the present case, the Court finds no error on the part of the ALJ in consideration of plaintiff's obesity. The ALJ expressly stated in his April 2004 decision that in determining plaintiff's RFC he considered her obesity and its combined effects with plaintiff's other impairments according to Social Security Ruling 02-01p.[195] Though the April 2004 decision has never become final, the ALJ expressly incorporated his findings from that decision into his final September 2006 decision.[196] Moreover, like the ALJ in *Prochaska*, ALJ Wenzel predicated his decision upon opinions of physicians who did discuss plaintiff's obesity.[197] None of the doctors who diagnosed plaintiff's obesity factored it in their RFC assessment or indicated that it contributed to plaintiff's physical limitations.[198] Finally, plaintiff fails to show how her obesity would have impaired her ability to work. Plaintiff only points out the ALJ's failure to consider the combined effects of her obesity on her RFC assessment, without specifying how her obesity would have precluded her from working.[199] Given (1) the ALJ's explicit mentioning of his consideration of the combined effects of plaintiff's obesity with her arthritis in his April 2004 decision; (2) the ALJ's reliance on physicians who noted and discussed plaintiff's obesity; and (3) plaintiff's failure to show

---

[193]*Id.*

[194]*Id.*

[195]R. at 646.

[196]R. at 31.

[197]R. at 648 (discussing the report of Dr. Kale specifically mentioning plaintiff's obesity); R. at 649 (discussing the findings of state examining physicians all of whom noted plaintiff's obesity (R. at 43, 374, 352, 566, 570)).

[198]R. at 349-52, 374-81, 566-69, 570-77.

[199]*See Prochaska*, 454 F.3d at 737 (citing *Skarbek*, 390 F.3d at 504.

how her obesity would have impaired her ability to work, the Court finds that the ALJ committed no error in considering plaintiff's obesity.

## 2. The ALJ's Assessment of Plaintiff's Credibility

Plaintiff next argues that ALJ Wenzel failed to properly analyze plaintiff's credibility under Social Security Ruling 96-7p, by ignoring plaintiff's complaints of pain and the side effects of her medications. The Commissioner, in contrast, contends that the ALJ's credibility finding is supported by substantial evidence.

An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the plaintiff can show that the finding is "patently wrong."[200] An ALJ's finding of credibility could be reversed only if he or she relies on an observation or argument that is unreasonable or unsupported.[201] An ALJ may disregard a claimant's assertion of pain if he or she validly finds claimant incredible.[202]

Further, Social Security Ruling 96-7p instructs that an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[203] An ALJ may not disregard a claimant's statements about the intensity and persistence of pain or other symptoms solely because they are not substantiated by objective medical evidence.[204] Rather, in making a credibility determination an ALJ must consider the entire case record, including the

---

[200]*Id.* at 738 (citing *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004)).

[201]*Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

[202]*Carradine*, 360 F.3d at 753-54.

[203]SSR 96-7p at *2.

[204] *Id.* at *1.

claimant's own statements as well as those provided by treating or examining physicians and other persons.[205] In addition, factors to be considered in evaluating a claimant's complaints of pain include: (1) the individual's daily activities; (2) the location, duration, frequency and intensity of a claimant's pain; (3) precipitating and aggravating factors; (4) type, dosage and side effects of any medication taken by a claimant to alleviate pain; (5) treatment that a claimant received for relief of pain; (6) any other measures a claimant used to relieve pain; and (7) other factors concerning claimant's functional limitations and restrictions due to pain.[206] While an ALJ is not obligated to consider each of these factors,[207] it is not sufficient to make a "single conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"[208]

Contrary to plaintiff's claim, the ALJ analyzed plaintiff's credibility in accordance with Social Security Ruling 96-7p by providing specific reasons, supported by relevant medical evidence and other evidence in the record, for his conclusion that plaintiff's claims were not entirely credible. First, the ALJ listed each and every complaint plaintiff has ever expressed to her doctors and in her testimony regarding her various limitations, impairments, pain, symptoms, side effects of her medication, and all medications she had been taking.[209] Next, the ALJ turned to the objective medical evidence and concluded that plaintiff's allegations regarding symptoms and functional limitations were inconsistent with the record and were exaggerated.[210] The ALJ gave four

---

[205] *Id.* at *2.

[206] 20 C.F.R. § 404.1529(c)(3); SSR 96-7p at *3.

[207] *See Skarbek*, 390 F.3d at 505 (upholding the ALJ's credibility determination even though the ALJ discussed only two factors listed in SSR 96-7p).

[208] *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

[209] R. at 647, 649.

[210] *Id.*

independent reasons for such a conclusion. First, the ALJ noted that "any treatment plaintiff has received for her alleged impairments has been routine or conservative in nature, and not generally the type of medical treatment one would expect for a totally disabled individual."[211] Indeed, the ALJ's decision shows that plaintiff's entire history of health problems from 1997 to 2004 based on the medical records of eleven physicians evidenced more or less conservative courses of treatment.[212]

Second, the ALJ noted that plaintiff's "use of medications does not suggest the presence of impairments which are more limiting that he has found."[213] The transcripts of the hearings of May 11, 2005 and August 16, 2005 show that the ALJ heard extensive testimony from plaintiff regarding her use of medications, including Methotrexate and their side effects, even if he did not discuss those side effects in his opinion.[214] Third, the ALJ pointed out that daily activities described by plaintiff were inconsistent with her alleged symptoms and limitations.[215] And finally, the ALJ noted that plaintiff reported not working since the alleged onset day of her disability, but it was later revealed not to be true.[216] The ALJ wrote that "[t]he fact that claimant provided inaccurate information on a matter so integral to determining disability suggests that much of what the claimant has alleged may be similarly unreliable."[217]

---

[211]R. at 649.

[212]R. at 647-49.

[213]R. at 649.

[214]R. at 846-47, 784-85, 787, 802-04, 810; *Prochaska*, 454 F.3d at 738 (implying that credibility determination is proper when the hearing transcripts show that the ALJ heard extensive testimony from plaintiff regarding her symptoms, even if he did not discuss those allegations in his opinion).

[215]R. at 650.

[216]R. at 649. Indeed, the claimant testified that she last worked in October of 2001, while the record indicates she was employed through March 1, 2002. R. at 789, 123.

[217]R. at 649-50.

In *Skarbek*, *supra*, the Seventh Circuit affirmed the ALJ's credibility determination where the ALJ found that plaintiff's testimony was not supported by medical evidence and his daily activities.[218] Though the ALJ in *Skarbek* only considered two factors listed in Social Security Ruling 96-7p, the court found it enough to comply with that Ruling.[219] Similarly, in this case the ALJ considered those two factors and also other evidence of plaintiff's questionable credibility. He did much more, therefore, than simply state that the allegations were considered and they were not credible. He provided specific reasons for his credibility finding which are supported by the case record. Accordingly, the Court cannot find that the ALJ's credibility determination was patently wrong and, thus, will not overturn it.

As a side note, without substituting its own judgment with the judgment of the ALJ, the Court points out that had the Court found that the ALJ's articulation of his finding of plaintiff's credibility was improper, substantial evidence in the record nevertheless supports the conclusion of plaintiff's questionable credibility. First, the ALJ pointed out at step one that plaintiff was collecting unemployment benefits and certifying that she was able to work from April to December of 2002, while her disability application alleged an onset date of October of 2001.[220] Second, at least two state examining physicians independently questioned plaintiff's effort during the examination of her grip strength.[221] Finally, Dr. Rohs, a state examining physician, noted during plaintiff's RFC evaluation in 2004 that on her last hospital visit plaintiff stated that she hurt her shoulder while moving a dresser.[222] Dr. Rohs observed that with the grip strength of 2/5 bilaterally, reported by plaintiff, it

---

[218]390 F.3d at 505.

[219]*Id.*

[220]R. at 645.

[221]R. at 568, 575-76.

[222]R. at 576.

would have been impossible for her to be lifting dressers.[223]

### 3. The ALJ's Consideration of Other Evidence Favorable to Plaintiff

Plaintiff next argues that in assessing her RFC the ALJ erred by ignoring significant favorable evidence that would have further restricted plaintiff's RFC. Namely, plaintiff points out that the ALJ did not consider the ME's testimony and found that: (1) plaintiff was able to carry twenty pounds with her right hand when the ME testified that plaintiff was not capable of carrying more than ten pounds; (2) plaintiff was able to stand six hours in an eight-hour work day, when the ME testified that plaintiff could stand for four hours; and (3) plaintiff could perform handling and fingering bilaterally when the ME testified that plaintiff was unable to do gross movements with her left hand. In addition, plaintiff argues that the ALJ failed to consider plaintiff's testimony that she had trouble sleeping, took regular naps, was often fatigued, and could only stand for 15-20 minutes continuously. The Commissioner responds, without citing to the record or any legal authority, that the ALJ's weighing of evidence was proper, and that plaintiff simply disagrees with it.

An ALJ's obligation to evaluate the record fairly does not mandate him to discuss every piece of evidence in the record.[224] However, an ALJ may not ignore an entire line of evidence that is contrary to his ruling.[225] Otherwise, it would be impossible for a reviewing court to tell whether the ALJ's decision is supported by substantial evidence.[226]

In support of her position that the ALJ ignored favorable evidence, plaintiff cites two Seventh Circuit cases, *Golembiewski v. Barnhart* and *Zurawski v. Halter*, both remanded in part

---

[223]*Id.*

[224]*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

[225]*Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

[226]*Id.* (citing *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000)).

because the ALJs failed to consider evidence contrary to their unfavorable decisions.[227] In *Golembiewski*, the ALJ entirely failed to discuss some of plaintiff's limiting conditions, like bowel and bladder dysfunction, ability to bend, and propensity to drop objects because of tingling in his hands.[228] Two doctors gave conflicting assessments of plaintiff's ability to stoop, and the court stated that instead of following his obligation to resolve it, the ALJ discussed neither assessment, improperly ignoring this limiting condition in his RFC analysis.[229] In *Zurawski*, the ALJ ignored plaintiff's disabling MRI results and failed to refer to any medical records made after these results became available.[230] The court held that this failure warranted remand for re-determination of plaintiff's RFC.[231]

Finally, plaintiff cites *Cuevas v. Barnhart* where the ALJ's failure to address unrebutted evidence of plaintiff's fatigue and napping throughout the day called for remand of her decision.[232] The court held that to the extent the ALJ chose not to address the issue of naps because she found plaintiff's testimony on this issue not credible, the ALJ should have explained her reasoning.[233]

These cases are distinguishable from the case at bar and the Court finds that the ALJ adequately considered evidence that was favorable to plaintiff. In his final September 26, 2006 decision the ALJ determined that plaintiff was able to carry twenty pounds with her right hand and no more than ten pounds with her left hand, and would be able to stand or walk for six hours in an

---

[227]*See Zurawski*, 245 F.3d at 888-89; *Golembiewski*, 322 F.3d at 917-18.

[228]*Golembiewski*, 322 F.3d at 917-18.

[229]*Id.* at 918.

[230]*Zurawski*, 245 F.3d at 888-89.

[231]*Id.* at 889.

[232]2004 WL 1588277, at *15-16 (N.D. Ill. 2004) (unpublished opinion).

[233]*Id.* at *15.

eight-hour work day.[234] In making this determination, the ALJ considered medical opinion evidence in accordance with the regulation's requirements,[235] giving controlling weight to medical opinions of those doctors who treated plaintiff, pursuant to Social Security Ruling 96-2p, and considering the findings of the state medical consultants pursuant to Social Security Ruling 96-6p.[236] Indeed, the ALJ relied on the assessments of Dr. Becker and Dr. Nagle who had treated plaintiff in 2002 and 2003.[237] In addition, the ALJ's RFC finding was almost identical to the findings of the state examining physicians, Drs. Free and Rohs, who performed the plaintiff's RFC assessments in 2002 and 2004, respectively.[238] Both doctors concluded in their assessments that plaintiff could lift twenty pounds occasionally and ten pounds frequently, and stand and walk for six hours in an eight-hour work day.[239]

During the August 16, 2006 hearing, the ALJ asked the ME his opinion regarding plaintiff's ability to lift.[240] The ME responded that even though Dr. Nagle limited plaintiff's lifting ability to five to ten pounds only to her left hand, feeling that she could do more lifting with her right hand, the ME nevertheless opined that "because she did have a little problem with her right wrist, I, I would limit her to no more than ten pounds of lifting."[241] The ALJ stated in his final decision that he considered opinion evidence in accordance with the requirements of the regulations and Social Security Rulings, properly giving controlling weight to the opinions of treating physicians and

---

[234]R. at 34-35.

[235]*See* 20 C.F.R. 404.1529 and 416.929.

[236]R. at 35.

[237]R. at 35.

[238]R. at 374-80 and 570-77.

[239]R. at 375, 571.

[240]R. at 816.

[241]R. at 816-17.

assessments of the state examining doctors in evaluating plaintiff's RFC.[242] Thus, it was proper for

the ALJ to follow the opinions of treating physicians and state examining physicians as opposed to

the opinion of the ME. The ALJ's failure to specifically discuss the ME's testimony was harmless.

The ALJ also asked the ME regarding plaintiff's ability to stand and walk during an eight-

hour day.[243] The ME pointed out that there was a discrepancy between what the medical records

indicated (plaintiff's ability to stand and walk for six hours) and what plaintiff stated in her

testimony.[244] The ME concluded that "[a]ccording to the patient's history, I would say maybe four

out of [an] eight hour [day]."[245] However, the ALJ indicated in his opinion that plaintiff's testimony

was not credible;[246] thus, he correctly relied on the medical records rather than on the ME's opinion

based on plaintiff's testimony. Even though the ALJ did not discuss the ME's testimony that was

inconsistent with his findings, the Court finds that this omission is harmless because the ALJ's RFC

determination is supported by substantial evidence. Unlike in *Zurawski* and *Golembiewski*, where

the ALJs truly ignored "an entire line of evidence" contrary to their unfavorable decisions,[247] in this

case the ME's hesitant statements regarding plaintiff's ability to lift, stand, and walk could hardly

qualify as "an entire line of evidence."

Further, the Court does not find any inconsistency in the ALJ's finding of plaintiff's ability

to do handling and fingering bilaterally, in spite of the ME's testimony that she was unable to do

---

[242]R. at 35; 20 C.F.R. 404.1527 (stating that when medical opinions are inconsistent, the opinions of treating physicians are generally entitled to controlling weight).

[243]R. at 817.

[244]*Id.*

[245]*Id.*

[246]R. at 649.

[247]*Zurawski*, 245 F.3d at 888-89; *Golembiewski*, 322 F.3d at 917-18.

gross movements with her left hand.[248] Both handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) and fingering (picking, pinching, or otherwise working primarily with the fingers) are examples of fine manipulation,[249] while the ME's testimony concerned gross manipulation.

Finally, the Court finds that the ALJ's failure to specifically address plaintiff's testimony regarding her troublesome sleep and necessity to take naps during the day is also a harmless error. Plaintiff's own testimony was the only source of this evidence.[250] Yet, the ALJ specifically stated that plaintiff lacked credibility.[251] Even though plaintiff's testimony regarding her daily naps was unrebutted on the record, like in *Cuevas*, the cases are nevertheless distinguishable. In *Cuevas*, the claimant's naps and fatigue was brought to the VE's attention, and the VE testified that if the claimant needed to take several naps during the day, he could not hold any job.[252] The court held that the ALJ could not ignore evidence that was contrary to her ultimate conclusion, especially "when she solicits the testimony and opinions of a VE at step 5, and then disregards this testimony without explanation."[253] In this case, the VE was never presented with the evidence regarding plaintiff's naps and fatigue. VE Gels was not present during plaintiff's testimony regarding her naps and the ALJ's interrogatories to her did not include this alleged limitation.[254] Plaintiff also did not attempt to correct this until she filed her brief. Indeed, upon receiving the VE's answers to the interrogatories, plaintiff's counsel requested the ALJ to submit additional hypotheticals to the VE, reflecting

---

[248]R. at 817.

[249]*See* SSR 85-15, at *7.

[250]R. at 810, 812-13.

[251]R. at 649.

[252]*Cuevas*, 2004 WL 1588277, at *15.

[253]*Id.* (citing *Sayles v. Barnhart*, 2001 WL 1568850, at *9 (N.D. Ill. 2001) (unpublished opinion)).

[254]R. at 256-57.

additional limiting conditions alleged by plaintiff.[255] None of the proposed hypotheticals contained any information regarding plaintiff's naps or troublesome sleep.[256] There is nothing else in the record supporting plaintiff's testimony regarding her daily naps. Thus, the Court finds that the ALJ's failure to specifically address plaintiff's troublesome sleep and daily naps was harmless because: (1) the ALJ stated that plaintiff lacked credibility; (2) neither plaintiff nor her counsel attempted to present this evidence to the VE to affect her vocational finding; and (3) there is no other evidence in the record supporting plaintiff's allegations of her daily naps.

**4. The ALJ's Assessment that Plaintiff's Impairments Did Not Meet Listing 14.09**

Plaintiff next challenges the ALJ's finding at step three that plaintiff's impairments did not meet or medically equal Listing 14.09A (inflammatory arthritis)[257] prior to May 1, 2005. Commissioner responds that the ALJ's finding is proper and cites evidence in the record that supports it.

Listing 14.09A provided at the time of the ALJ's decision that to show inflammatory arthritis severe enough to meet the listing, the claimant must have "[H]istory of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflamation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively...."[258] Plaintiff concedes that she was able to ambulate effectively, but argues that she met Listing 14.09A because of inflammatory arthritis in both of her wrists that resulted in her inability to effectively do fine and gross manipulation prior to May of 2005.

---

[255]R. at 267-68.

[256]*Id.*

[257]20 C.F.R. Pt. 404, Subpt. P, App. I.

[258]*Id.*

The regulations define inability to perform fine and gross movements effectively as,

an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.[259]

Plaintiff cites pages in the record where Drs. Kale, Margules, and Nagle discussed reduced grip strength, midcarpal instability, and discomfort in both of her wrists prior to May of 2005. However, plaintiff does not reveal the whole picture. For instance, while citing Dr. Kale's report of January 26, 2002, stating that plaintiff had reduced grip strength 4/5 bilaterally, plaintiff omits the finding on the same report that plaintiff's "range of motion of the shoulders, elbows, wrists and fingers is normal. There is normal ability to grasp and manipulate objects."[260] Similarly, plaintiff does not reveal that: (1) Dr. Nagle released her for work in March of 2002; (2) in May and June of 2002 plaintiff admitted to Dr. Nagle that her left wrist felt "relatively good" after the surgery; and (3) in October of 2002 Dr. Nagle noted that there was no midcarpal instability in her left wrist and that plaintiff would be going back to work soon.[261] Numerous other physicians who treated or examined plaintiff between October of 2001 and May of 2005 either released plaintiff for work finding her condition satisfactory (Drs. Collins and Becker in 2001 and 2002)[262] or questioned plaintiff's effort while reporting her grip strength during the physical examination (Drs. Kale and

---

[259]*Id.*, section 1.00B2(c).

[260]R. at 351.

[261]R. at 386, 519, 524, 522.

[262]R. at 355, 414, 456, 457.

Rohs in 2004).[263] The ME also testified at the August 2005 hearing that plaintiff did not meet Listing 14.09 because she could ambulate effectively and did not have manipulation problems with her right wrist.[264] Indeed, except for the August 2004 and 2005 reports of Dr. Margules, none of her doctors ever stated anything even close to plaintiff having "an extreme loss of function" of both wrists that prevented her from being able to sustain daily activities. The ALJ considered but refused to give controlling weight to Dr. Margules' 2004 report finding it unsupported by other objective medical evidence.[265] At the same time, the ALJ granted controlling weight to Dr. Margules' August 2005 report, giving it retroactive reach to May 1, 2005, thus finding that plaintiff met Listing 14.09A as of that date.[266] Therefore, this Court finds that the ALJ did not err in his assessment that plaintiff met Listing 14.09A as of May of 2005 because this finding is supported by substantial evidence.

---

[263]R. at 568, 576.

[264]R. at 816.

[265]R. at 36.

[266]R. at 38.

### 5. The ALJ's Inquiry Whether the VE's Testimony Was Consistent with the DOT and Consideration of the VE's Testimony that Was Favorable to Plaintiff

Plaintiff's next arguments for reversal are: (1) the ALJ's non-compliance with Social Security Ruling 00-4p by failing to ask the VE whether her testimony was consistent with the DOT; and, (2) ignoring the VE's testimony that was favorable to plaintiff. The Court will address these arguments in turn.

### A. Failure to Inquire Whether the VE's testimony Was Consistent with the DOT

Social Security Ruling 00-4p states that when a VE provides evidence about the requirements of a job or occupation, an ALJ "has an affirmative responsibility to ask about any possible conflict" between the VE's testimony and the DOT, and if the evidence appears to conflict with the DOT, the ALJ should obtain an explanation for the apparent conflict.[267] Arguing that the ALJ failed to fulfil his duty to ask the VE about the inconsistencies, plaintiff relies on *Prochaska* where the Seventh Circuit reversed the ALJ's decision, in part, for failure to do so.[268]

In *Prochaska*, the VE identified four positions that were available to plaintiff in spite of her limitations, and the ALJ failed to inquire whether the VE's testimony was consistent with the DOT.[269] The court held that the ALJ bears the burden of making the necessary inquiry.[270] But the plaintiff also demonstrated that each job identified by the VE required specific capabilities that were beyond her limitations.[271] It was unclear to the court whether those jobs actually required the capabilities noted by plaintiff, and it was exactly the inconsistency that warranted remand.[272] The

---

[267]SSR 00-4p, 2000 WL 1898704, at*4 (2000).

[268]454 F.3d at 736.

[269]*Id.*

[270]*Id.* at 735.

[271]*Id.* at 736.

[272]*Id.*

court sent the case back to the ALJ but not so that he could ask the VE the magic question, but to resolve the "potential inconsistency in the evidence" identified by plaintiff.[273]

Most recently the Seventh Circuit again addressed this issue in *Coleman v. Astrue*.[274] Like plaintiff here, the claimant in *Coleman* challenged the ALJ's failure to ask the VE whether her description of jobs was compatible with the claimant's limitations and whether that was consistent with the DOT.[275] The claimant identified apparent inconsistencies between the DOT requirements and the VE's testimony for a number of jobs listed by the VE.[276] However, the court held that even subtracting all these jobs and counting only one remaining position of order clerk identified by the VE that was not inconsistent with the DOT, 1,500 positions were still available to a person with the claimant's limitations.[277] The court then cited its prior precedents holding that 1,400 jobs, and even fewer than 750 positions, amounted to a significant occupational base.[278] Thus, the court concluded that failure to comply with Social Security Ruling 00-4p was a harmless error because a significant number of jobs not inconsistent with the DOT were still available to the claimant.[279]

There are clear parallels between the circumstances in *Coleman* and those in the present case. ALJ Wenzel sent interrogatories to the VE but failed to affirmatively ask whether her answers to the interrogatories were consistent with the DOT.[280] In her answers the VE identified three categories of jobs that were still available to plaintiff in spite of her limitations: cashier, light, unskilled, 8,000

---

[273]*See id.*

[274]269 Fed.Appx. 596, 601-602 (7th Cir. 2008).

[275]*Id.* at 601.

[276]*Id.* at 602.

[277]*Id.*

[278]*Id.* (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (internal citation omitted)).

[279]*Id.*

[280]R. at 256-57.

positions in the Chicago area; assembler of small products, light, unskilled, 8,000 positions; and, case aide, light, semi-skilled, 6,000 positions.[281] Not earlier than in her reply brief plaintiff attempts to identify only one potential inconsistency between the VE's testimony and the DOT regarding the case aide position. Plaintiff argues that according to the DOT, the case aide position is semi-skilled and thus requires an applicant to possess transferrable skills.[282] Plaintiff then states that "the vocational expert did not testify that Ms. Hollins acquired any transferrable skills in her past work," and that "she [plaintiff] had no transferrable skills."[283] Contrary to plaintiff's representation to this Court, however, the VE did testify that plaintiff possessed transferrable skills due to her work experience that included semi-skilled positions, such as workshop aide and developmental tech, and due to her prior experience involving public contact.[284] But even accepting this inconsistency as valid, the *Coleman* decision dictates the Court subtract 6,000 case aide positions, finding that there were still 16,000 jobs available to plaintiff to perform with her limitations.[285] This number is more than enough to constitute a substantial occupational base,[286] therefore, the ALJ's failure to follow Social Security Ruling 00-4p was harmless.

## B. Ignoring the VE's Testimony that Was Favorable to Plaintiff

Plaintiff next claims that the ALJ failed to discuss the VE's testimony favorable to her. The Court disagrees. The ALJ posed questions to the VE based on two hypothetical examples of RFC.[287] The examples were identical except that the second one additionally included absences from work

---

[281]R. at 263.

[282]*See* DOT # 195.367-010.

[283]Pl. Reply Br. at 12-13.

[284]R. at 841-42.

[285]*See* 269 Fed.Appx. at 602.

[286]*See Lee*, 988 F.2d at 794.

[287]R. at 256-57.

two or three times a months due to symptoms of pain and fatigue.[288] The VE answered that the jobs were available under the first hypothetical but not under the second.[289] Plaintiff claims that the ALJ failed to discuss the VE's response that no jobs were available for an individual under the second hypothetical. Plaintiff argues that "[a]n ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all relevant evidence."[290]

In addition, plaintiff cites *Sayles v. Barnhart* where the case was remanded because the ALJ addressed only one of the eight hypotheticals posed to the VE.[291] The court held that when the ALJ solicits information from the VE, he cannot disregard it at step five of his analysis.[292] The court noted, however, that the ALJ's failure to address other hypotheticals was "particularly problematic" because the testimony of the VE that the ALJ adopted was based on a hypothetical that departed from factual findings made by the ALJ in his opinion.[293]

Plaintiff's arguments, though not without merit, are inapplicable to the present case. First, the ALJ did not ignore the VE's testimony. The second hypothetical included plaintiff's RFC determined by the ALJ and also symptoms of pain and fatigue alleged by plaintiff.[294] The ALJ explicitly stated that plaintiff's allegations regarding her symptoms and limitations were credible as of May 1, 2005.[295] As stated above, this Court finds the ALJ's credibility analysis to be

---

[288]R. at 257.

[289]R. at 262-64.

[290]*Smith*, 231 F.3d at 438 (internal citation omitted).

[291]2001 WL 1568859, at *8-9 (N.D. Ill. 2001) (not reported in F.Supp.2d).

[292]*Id.* at *9.

[293]*Id.*

[294]R. at 257.

[295]R. at 38.

appropriate. Therefore, the ALJ's second hypothetical affected the ALJ's determination that plaintiff was disabled as of May of 2005. In addition, unlike in *Sayles*, the ALJ's finding of plaintiff's RFC was identical to the RFC that the VE used to render her opinion regarding positions available to plaintiff.[296] Therefore, the Court holds that the ALJ properly based his finding - that plaintiff was not disabled prior to May of 2005 - on the first hypothetical submitted to the VE, while the VE's response to the second hypothetical was taken into consideration in rendering the decision in favor of plaintiff, finding disability as of May of 2005.

### 6. ALJ's Obligation to Provide Plaintiff a Fair Hearing

Finally, plaintiff argues that the ALJ failed to provide her a fair hearing by: (1) not allowing her attorney to cross-examine the VE; and (2) by not calling plaintiff's witness to testify on her behalf. The Court will address these issues in turn.

### A. Cross-examination of the VE by the plaintiff's attorney

During plaintiff's fourth hearing on August 16, 2005 the ALJ had to adjourn due to time constraints without hearing the testimony of the VE.[297] In lieu of direct testimony, the ALJ sent VE Linda Gels[298] written interrogatories based on two hypothetical examples of RFC.[299] She responded in writing that while under the first hypothetical plaintiff would still be able to perform certain jobs that exist in the national economy, the second, more restrictive example of RFC left no jobs available for plaintiff to perform.[300] Upon receiving such answers, plaintiff's counsel requested that

---

[296]R. at 34-35, 256.

[297]R. at 824.

[298]VE Linda Gels was present at all plaintiff's hearings except for the one on August 16, 2005. R. at 256.

[299]R. at 256-57.

[300]R. at 262-64.

she be allowed to submit additional hypotheticals to the VE with an even more restrictive RFC.[301]

Those questions seemed to be based on plaintiff's own testimony regarding her limitations, such as the inability to walk more than two blocks and on Dr. Margules' August 2005 report, noting "profound" limitations in plaintiff's ability to use both hands for fine manipulation.[302] The ALJ, however, declined to pose those additional questions to the VE finding that the significant impairment in plaintiff's ability to do bilateral fine and gross manipulation was not established on the record prior to May 1, 2005.[303]

Plaintiff argues that such a finding is unwarranted and cites the record where Drs. Kale, Margules, and Nagle discussed problems with both of her wrists. However, as discussed in Section Four above, plaintiff again omits important findings of Drs. Kale and Nagle that dispel any doubts as to plaintiff's true ability for fine and gross manipulation for the period in question.[304] On the other hand, Dr. Margules' reports were considered by the ALJ, but he declined to give them controlling weight prior to May of 2005 as they were not supported by other objective medical evidence.[305] It is not the reviewing court's position to re-weigh evidence, and this Court gives deference to the ALJ's finding on this issue as it is supported by substantial evidence.

It should be noted that plaintiff also supports her position by citing *Schmoll v. Harris*.[306] In that case the court questioned the adequacy of the hearing and raised due process concerns when the ALJ did not give an unrepresented claimant a chance to cross-examine a medical witness about

---

[301]R. at 267-68.

[302]R. at 268, 603, 789.

[303]R. at 37.

[304]*See, e.g.,* R. at 351 (where Dr. Kale reports in January of 2002 that plaintiff's "range of motion of the shoulders, elbows, wrists and fingers is normal. There is normal ability to grasp and manipulate objects.").

[305]R. at 36, 38.

[306]636 F.2d 1146, 1149 (7th Cir. 1980).

a vital part of the medical evidence.[307] The court reversed the ALJ's decision, though not because of the violation of the claimant's due process right, but because the decision lacked evidentiary support.[308] *Schmoll* is distinguishable from the present case because plaintiff here was represented and the proposed cross-examination would not have elicited any evidence supporting plaintiff's disabling condition. The ALJ knew that had he allowed those questions, the VE would have responded that there were no jobs available to plaintiff;[309] however, he rightfully declined to pose those questions to the VE having concluded that the hypotheticals were unsupported by the evidence.[310]

Similarly distinguishable is *Lonzollo v. Weinberger*, where the court stated that the claimant has a right to cross-examine a physician regarding his report. [311] This unquestioned right is not implicated in the present case.

Finally, the Hearings, Appeals and Litigation Law Manual[312] instructs that even though the claimant and the representative have the right to question the VE fully on any pertinent matter, "the ALJ will determine when they may exercise this right and the appropriateness of any questions asked and answers given."[313] It was completely appropriate for the ALJ to not allow the hypotheticals proposed by plaintiff's counsel since he had determined that they were not supported

---

[307]*Id.*

[308]*Id.* at 1151.

[309]R. at 37.

[310]*Id.*

[311]534 F.2d 712, 714 (7th Cir. 1976).

[312]The Hearings, Appeals and Litigation Law Manual ("HALLEX") was promulgated by the SSA Office of Disability Adjudication and Review and was written to convey "guiding principles, procedural guidance and information to the Office of Hearings and Appeals stuff." HALLEX, I-1-001; *see also Cromer v. Apfel*, 234 F.3d 1272, 2000 WL 1544778, at *2 (7th Cir. 2000) (unpublished opinion).

[313]HALLEX I-2-6-74(c), 1993 WL 751902 (2005).

by the objective medical evidence in the record.

**B. Testimony of Plaintiff's Witness**

On August 16, 2005, during the fourth hearing on plaintiff's case, plaintiff's witness, Renita Jones, did not have an opportunity to testify because of time constraints.[314] Plaintiff argues that her right to a fair hearing was impaired because the ALJ failed to hold yet another supplemental hearing to give Ms. Jones an opportunity to testify. Plaintiff argues that the ALJ failed to develop a full and fair record by not exploring all relevant facts.[315]

The SSA regulations provide that an ALJ may ask the witnesses any questions material to the issues and shall allow the parties or their representatives to do so.[316] Nevertheless, the Court finds that failure to call Ms. Jones to testify was at most a harmless error. First, having to adjourn the hearing earlier, the ALJ specifically asked plaintiff's counsel to submit any additional comments or statements to him in writing.[317] Yet, plaintiff's counsel failed to do so. Had Ms. Jones' testimony been essential to plaintiff's case, counsel would have asked Ms. Jones to submit an affidavit or a written statement with her testimony. Instead, one year after the hearing took place plaintiff's counsel asked the ALJ to hold a supplemental hearing to give Ms. Jones an opportunity to testify.[318]

But more importantly, plaintiff testified during the August 2005 hearing that Ms. Jones moved in with her to share household expenses and assist with daily chores about a month and a half

---

[314]R. at 824.

[315]*Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).

[316]20 C.F.R. § 404.950(e); 20 C.F.R. 416.1450(e).

[317]R. at 824.

[318]R. at 268.

ago. [319] Therefore, Ms. Jones should have had first-hand knowledge of plaintiff's daily activities as of June or July of 2005. In his final September 2006 decision, the ALJ found plaintiff disabled as of May 1, 2005,[320] and plaintiff only appeals the finding of not disabled between October of 2001 and May of 2005. It is apparent that Ms. Jones would not have had first-hand knowledge of plaintiff's daily activities during the period in question. In fact, there is no evidence in the record that Ms. Jones even knew plaintiff before she moved in with her in the summer of 2005. Thus, the Court finds that the failure to hold a supplemental hearing to give Ms. Jones an opportunity to testify was a harmless error.

## CONCLUSION

Harmless errors in administrative proceedings "do not require (or indeed permit) the reviewing court to upset the agency's decision."[321] This is such a case. For the reasons set forth above, the Court finds that the ALJ's September 26, 2006 decision is supported by substantial evidence. Accordingly, the Court denies plaintiff's motion for summary judgment [dkt 23].

**IT IS SO ORDERED**

**ENTERED: August 22, 2008**

**Susan E. Cox**
**UNITED STATES MAGISTRATE JUDGE**

---

[319]R. at 806.

[320]R. at 38.

[321]*Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) (citing *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7 th Cir. 2004)).